The first one is Melendez v. City of New York, 20-4238. The first case on the calendar is on submission, which is 20-1370, Long v. Corning, Incorporated. So we'll begin with Melendez, and Claude Zyphers is up. Thank you, Your Honor. May it please the Court. During May of last year, the City Council enacted three laws, all of which violate the U.S. Constitution. The first involves the cancellation of personal guarantees, which were a primary inducement to the execution of a commercial lease, and which we submit violates the Contracts Clause. The guarantee law is an illogical exercise of legislative power, and we submit will actually likely harm the special interest group it was designed to protect, commercial tenants. The second set of laws prevents landlords in New York City from making lawful rent demands to commercial and residential tenants, respectively, and which we submit violates the First Amendment. Let me turn first to the Contracts Clause analysis of the guarantee law. In short, the guarantee law violates the Contracts Clause because it forever prohibits landlords from enforcing personal guarantees executed as security for commercial leases for defaults occurring between March 7, 2020, and June 30, 2021, and that includes now two extensions of the law. The guarantee law, the test for whether a law violates the Contracts Clause is well settled. First, we look at whether the law substantially impairs contractual rights, and if so, we determine whether the law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose. Let me turn first to the substantial impairment issue. First, here it is unquestioned that there was a substantial impairment. First, the personal guarantee was a primary inducement to entering into the lease with the commercial tenant. Without the execution of the guarantee from a party that voluntarily agreed to be responsible for these payments, the lease would never have been entered into. The guarantee is a vital part of the transaction, and we've submitted the declarations of both Appellant Faulkner and Mr. Galino, our legal experts, who make that clear. Next, the restriction is permanent. The commercial landlord cannot collect any amounts from the guarantor for any default arising during the period of the law ever. That right is lost in perpetuity. And, Your Honors, we submit that this Court can take judicial notice of the recent HB 719, which was passed by the Maryland Legislature, which also relates to personal guarantees and personal liability provisions. And that new law, unlike the law here, is simply just a temporary stay of enforcement, not a permanent loss. And it also added a 180-day breathing spell after the end of the law, during which there cannot be enforcement of a guarantee, but then after which there can be. And then last, the passage of the guarantee law was completely unforeseeable at the time of execution of any of the guarantees that were impacted by the law. No one could have predicted the pandemic, and even more importantly, no one could have predicted that the City Council would have thought to completely eviscerate personal guarantees. We submit that not only is this a substantial impairment, but a severe one. And as the Supreme Court made clear in Allied Structural Steel v. Spinoz, quote, the severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual... Excuse me, let me interrupt you. Let me interrupt you for a moment. I'm not sure you quote that in context. I mean, the Supreme Court is distinguishing between impairments that might be resolved at the step one of analysis, and in circumstances such as the one you've indicated, impairments that then would warrant further inquiry, but they don't say it requires a heightened standard. I'm not sure that I think you quoted correctly in context. Am I missing something? Yeah, Your Honor, I would submit that, and actually I was going to read the rest of the quote, because the rest of the quote is actually, I think, quite informative here. What the Supreme Court said in Spinoz was, quote, severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation. And that's at 488 U.S. 245. And so, Your Honor, we don't actually misquote it, and I would submit that... As before says, minimal alteration may end the inquiry at its first stage. So I understood the severe impairment simply to push us to the second and third stages. But let me let you continue with your argument. Go ahead. Sure, of course. But again, I would submit that what the court there said was a careful examination of the nature and purpose of the state legislation. It didn't talk about the complete abdication or the complete deference that Judge Abrams below and that the city would submit. So let me turn to the legitimate public purpose prong. And here, the question on whether there's a legitimate public purpose is whether the law is truly passed as an exercise of the government's police power to benefit the general welfare, or whether it provides just the benefit to a political or narrow class of special interests. And here, Your Honors, I would submit that the question is not whether there's an emergency only, which is what the city wants you to understand. You don't just throw out the constitutional protections just because there's an emergency. Here, even the district court recognized that on its face, the guarantee law benefits only commercial tenants. And in short, what the city council did here was narrowly meddle in the individual commercial leases and simply reallocated... Looking at the materials relied on by the city council, they seem to be taking into account a certain subset of commercial tenants that was affected by the governor's orders and looked at that in the broader context of people who are employed by those small businesses, which seem to be a vast number of people, as well as people who are served by those small businesses. And they considered at the beginning a larger swath of people or entities that would be forgiven their guarantee for a period of time and then tailored it over time. And there was exigency. There were urgent circumstances that required fast action. They held hearings. They went through a lot of material. And yet you've called this a legitimate conception of the public interest and as if they're benefiting just commercial landlords with no other broader purpose. How is that fair? So, Your Honor, it is fair because one, simply saying that you're benefiting the society at large doesn't actually make it so. And importantly, what the case law focuses on is that eliminating... They didn't say they were just benefiting society at large. They made a measured assessment in exigent circumstances as reflected by the legislative history of the interaction between small businesses that would be affected by the governor's orders and the closure orders and the populace of New York served by those and employed by those businesses. That wasn't just a broad and crude blunderbuss statement of public interest. No, but Your Honor, just simply... Is that really fair? I believe it is, Your Honor, because what they've done here is simply target one provision in a contract and simply target that and say, hey, this is going to help keep all businesses open. And two, the guarantee law goes too far, right? Because it impacts all personal guarantees. And as we set forth in the papers, it impacts tens of thousands of personal guarantees. And importantly, it impacts any personal guarantee, not just those for actually who need the help and those who actually are in financial distress. It allows personal guarantors who have the financial resources to pay to basically escape potential liability and to escape payment. So that's why, Your Honor, the law goes too far. And that's part of the problem. Let me ask you, are you asking us really to apply strict scrutiny to this legislation? You say it's a severe burden on commercial landlords and therefore we should really look to require the legislature to take the least restrictive means possible to affect its purposes. Is that a fair characterization of your argument? No, we're not actually, Your Honor. We're not asking for the court to take strict scrutiny here. What we're asking for the court to do is to look at whether there are reasonable protections. And as the Supreme Court said in Hahn and in other cases, to not allow a studied indifference of the right of the landlords. That's what happened here is that there were absolutely no protections that were made for the landlord. And as the Supreme Court said in Hahn and other cases, when you have that type of studied indifference and you don't have reasonable protections, and that's what Cardozo says in the Worthen case and also made clear in the Spanau's case, without those reasonable conditions and those reasonable protections put in place, this type of law is not reasonable and necessary and goes too far. Excuse me, you have one... Go ahead. One minute left? Yes, I'm sorry. Thank you, Ms. Rodriguez. What about the question of deference to the legislature and what's undoubtedly a huge and unexpected emergency for us all that is continuing? We are instructed by the Supreme Court to defer, even in the case of a substantial impairment, to defer to the legislature's judgment about what is reasonable and necessary, what measures are reasonable and necessary to take. And that's particularly a heightened deference due to the legislature in the context of a situation where the state itself is not welching on business deals and isn't benefiting itself in its own public contracts. But in fact, here, it's foregoing tax revenues, potentially. I mean, it's kind of the contrary of that, which would suggest to me that we would give them even more deference once they've made the political judgment and the judgment about how best to protect the populace and the economy in New York. What's wrong with that way of thinking about what their choice has been and the kind of deference we owe them? Sure, Your Honor. And we are not asking for strict scrutiny here. And the deference here should be, as the Supreme Court said in Spinaus, that if the Contracts Clause, quote, and this is at 242, if the Contracts Clause is to retain any meaning at all, however, it must be understood to impose some limits upon the power of a state to abridge existing contractual relationships. And that's what we're asking this court to examine and what we submit Judge Abrams failed to do. Substantial deference is not complete deference, an absolute deference. And that's exactly what happened here. Essentially, the court below didn't actually test whether or not the law was actually reasonable or necessary. She didn't actually test whether there was a legitimate public purpose and simply took the city at its word. And so, again, I would point the court to the language in Spinaus that says if the Contracts Clause is to retain any meaning at all, however, it must be understood to impose some limits upon the power of a state to abridge existing contractual relationships. And that's what we're asking this court to do. There have to be some limits. You can't simply just say there's an emergency and therefore the state or the city can decide to severely impair all contractual rights for certain specific parties, which is what happened here. That's exactly what happened here. May I ask you a question? This is Judge Raji. Looking at this in light of both what the governor did and now the New York City Council did, am I correct in understanding that the actual tenant remains obligated for the rent, even though you cannot collect it right now or cannot evict him right now, that that rent obligation is temporarily rather than permanently limited? Is that right? That's right, Your Honor. But I would submit, if I can, that the key problem, and it's what I said at the outset, why this law is so illogical. So let's say the guarantee law disappears and it goes away on July 1st, which is the date it's supposed to, you know, unless it's extended. What's illogical about this is, and the city wants to tell you, hey, we have the right to seek payment from the tenant. But if we're seeking payment from the guarantor, it's because the tenant has defaulted and the tenant doesn't have the resources. And so that's why this bill makes no sense. No, I understand that. My question was really a preliminary one. So what we have here is a tenant whose obligation is temporarily limited, but a guarantor whose obligation is permanently voided, at least for the period of time that the law is in effect. Is that correct? That's exactly right, Your Honor. That's exactly right. I may have some questions for you, Adversary. I wanted to make sure I understood that that's how it all works out in the end. Thank you. No, that's right. And thank you, Your Honor. This is Judge Cabranes. I'm not sure I quite understood the response to Judge Razi's last question. I had been under the impression that the guarantee law negated the liability of the guarantor in perpetuity. Is that correct or not? So, Your Honor, I'm happy to explain. What the guarantee law does is negate the ability for a landlord to seek payment for a guarantor for a default that occurs during the period of time of the law. So, for example, here it's March 1, 2020 to currently June 30, 2021. That right is lost in perpetuity. My clients will be able to seek payment from a guarantor for future payments after the law has ended. But what has been lost in perpetuity is the right on a default during the period of time of March 1, 2020 to June 30, 2021. Does that answer Your Honor's question? I think so. But just so that I'm clear too, down the road, you could still try and recover from the tenant the rent that was not paid during this period, correct? That is right. The tenant might go into bankruptcy. The tenant might not pay you for a whole host of reasons. But as a matter of law, you have not lost that right to pursue it. Right. I haven't lost that right against the tenant. But again, I would submit, Your Honor, that if the tenant isn't paying me and I'm seeking payment from the guarantor, having the ability to go and ask the tenant now on July 1st for those funds is completely pyrrhic and makes no sense. Right. But what everyone was assuming here was that the tenant might be a small business operation, you know, with a corporate entity or some kind of a non-individual entity and that the owner, the human being owner of that person was often the guarantor, correct? That is commonly the case. There are other times where others serve as the guarantor. I don't want to represent to the court that it's always the case that it's the same person, but that is a common situation. All right. And as I said, this may prompt some questions for your adversary. I just wanted to clarify how it all worked out. Thank you. Yeah, of course. I'm mindful of the time. I don't know if Your Honor has more questions for me. Not at this time. Thank you. Jameson Davies for the appellee. Thank you, Your Honor. May it please the court. My name is Jameson Davies for the appellee. The district court's order granting the defendant's motion to dismiss should be affirmed. The challenge law came in response to the generational economic and public health crisis, which inflicted harms on nearly everyone in the city and the country. Council acted to alleviate some of those harms and to position the city to recover from the crisis as rapidly as possible, and the actions it took are perfectly constitutional. First, as the contract clause claims, facial challenge to the personal guarantee law fails. Plaintiffs have not shown that the law substantially pairs existing contractual rights in all its applications. And even here, it's somewhat unclear because they allege that their tenants stopped paying rent in December 2019 before the initial period of the guarantee law went into effect. You know, counsel, it seems to me that a large part of your argument tries to get us to look at the guarantee law in isolation. But the city council enacted it against the backdrop of all of the governor's actions, which made it very difficult to enforce contract obligations by the tenant. So I don't know how we can really look at this law and its alleged impairment of contract without recognizing that there was no ability to go after the actual tenant. What am I missing? I think that's right, Your Honor. There is a context to this, and I think that context is even reflected in the contours of the law because it is limited to businesses who are forced to close by certain subset of the government's executive orders. But it does show that the ability to go after the tenant remains, and they can collect rent from the tenant. There's moratoriums on evictions and things like that. Well, let me ask you this then. If the concern here is keeping these businesses in operation or at least in hibernation so that they can then resume when the crisis is over. I can understand how that argument might be made with respect to the governor's actions protecting the tenant. How is the continuing business operation served by the action the council took with respect to guarantors? Sure. The way it's served with respect to guarantors is that because the guarantors – and in this case, the guarantee law applies only to natural persons. So they're facing personal liability and personal bankruptcy, and that's what the record shows as well of the people who wrote in to advocate in favor of this law. And they would be more likely to shut down if they're worried about facing personal liability and personal bankruptcy versus just the bankruptcy of a corporate entity. But only if the guarantor is in fact the person operating the business, right? I mean, if instead somebody's brother-in-law signed the guarantee or somebody's father, that might not affect whether the business remained in operation. I mean, in those circumstances, I don't think that – I think the most common circumstance is that the business owner is the guarantor, and that's reflected, I think, in the legislative record. But also, even in those circumstances that your honors identified, there still may be – you don't want to impose personal liability necessarily on family members, maybe even more so than yourself if you're worried about throwing someone into personal bankruptcy. Well, that goes into what the public interest here is, and we start with the fact, don't we, that the choice has been made to favor tenants and guarantors over landlords. So do we have a problem here with this not being – this being a kind of contract impairment that picks sides? I don't think so, Your Honor, and I would just clarify a little bit. I wouldn't say it's just commercial tenants versus landlords. I would say it's commercial tenants and their employees and customers potentially versus landlords. But if you look, every contract – every case that implicates the contract clause is going to involve the diminution of one party's rights relative to another's. So the question is whether there's a broader public interest to be served. And I think the court in Energy Reserves Group indicated that the government has to identify a legitimate public purpose. And also in this court, in Buffalo Teacher said the plaintiff must produce evidence that the law was not motivated by the general welfare. So here I don't think there's any real reason to think – and there's nothing that the plaintiffs have pointed to to suggest that this wasn't aimed at the general welfare. They might dispute whether or not it was the most effective means, but – Nonetheless, to follow up on Judge Radji's questions, I mean, once we find that there's a substantial impairment, we need to still look at whether the measure taken was reasonable and necessary. And that measure of necessary and reasonable is, in my view, related probably to the kind of impairment that is imposed. Here we have a permanent loss imposed on the commercial landlords. Not just the delay in collecting or some temporizing measure. It was put in place initially for six months. It's been extended six months and looks like it will be extended again until the end of June. The contours of that deprivation haven't been revisited as far as I can tell. I mean, I guess there was a new declaration added by the council in September. Nonetheless, there seems to have been very little effort to reshape the measures over the period of the last year. And we have a changing landscape with businesses opening up now and the governor's orders being lifted and so on. So I'm a little concerned that the permanency of the deprivation that's affected here hasn't been adequately taken into effect perhaps by the council. Can you allay my concerns that this was not really reasonable and necessary given the extent of the deprivation? Of course, Your Honor. Two responses to that. I think that it is still limited in time, even though it does permanently deprive landlords of the rents for that statutory period. But even completely permanent deprivations have been upheld, such as in the Benedictus, which totally abrogated liability waivers in contracts for mining. And in this court sanitation case, which capped at two years contracts for carting and allowed immediate termination of some others with no ability to extend those terms. But the second response there is I think that the city's reopening that you point to suggests actually why this is reasonable, because it permits those tenants now who are the LLCs are now able to generate income and they may be able to even pay back rent. They may be able to pay at least some rent ongoing. So I would say it's evidence that the guarantee law worked. Now these businesses are able to go back into service. The actual tenant who's often an LLC will be able to pay at least some of the rent and maybe hopefully a lot of it. And they have incentives in order to keep operating to make their back rent and to keep paying the rent going forward. Your adversaries point out in their brief that landlords also have obligations that they've not been able to meet or cannot meet without rent payments, specifically their taxes, their insurance, their maintenance costs. What's your response to that in that, again, the suggestion is that you favored one side of the contract to the detriment of the other? Sure. Certainly there's no doubt that the pandemic has inflicted harms on almost anybody. The question here is how much deference and the ability of the council to choose how to sort of alleviate that harm. And in some ways it's going to be alleviated somewhat differentially between the two. So I would point out that the landlords have the benefit of the corporate forum. Almost everyone here is suing on LLCs. So to the extent that they have obligations, they actually have the protections that the personal guarantors don't to potentially limit their liability to the LLCs. But I would also just go back to my earlier point, which is that contract clause cases just of necessity are going to involve the diminution of one party's rights. And that's not necessarily fatal. The question is whether or not, as this court has held, is a rational basis test as to whether or not the legislature's determination of whether the means are reasonable and appropriate is sufficient to pass constitutional muster. What is the limiting principle on a legislature's ability to impair contracts? I mean, it seems that there's almost always some economic or health or other concern that can be invoked. What is the limitation? I mean, looking at your brief, the only cases you point to that suggest we would do any kind of strict scrutiny are cases where a legislature is trying to limit its own or its own contracts. But what are the limiting principles here? Sure. Aside from the cases where a state is trying to limit the enforceability of its own contracts, I think spinouts is really the high watermark here. And one of the only recent cases where the Supreme Court invalidated a private contract impairing law. And I think the circumstances there suggest that if it's targeting a very specific narrow group. So in that case, it was really just one employer that was targeted and the law was actually the legislator knew when it was going to be passed that it was going to be preempted by ERISA six months later. So it was going to operate only on basically one company for a period of six months. And I think that court inferred there that from from that evidence that this was really directed at a specific entity and rather than an overall broader public purpose. But beyond that, I think the Supreme Court has been very willing to to give the legislator a lot of deference, as long as it's a case where it's not state contracts that are impaired. And I would also point the court to Energy Reserve's Note 13, which gives a discussion of spinouts and suggests that that is really sort of the high watermark of invalidation. My disquiet is that that suggests that a constitutional term that's written in an absolute form to be, you know, that there shall be no impairment of contract is, in fact, what you're urging is that there can almost always be impairment of contract, except in these very, very narrow circumstances. Tell me why I shouldn't have that concern. Yeah. So I think starting, you know, with the Great Depression cases, the court recognized that the contract clause, although it is written in absolute terms, is really not to be read meant to be read as literally as it's written. And that's because it can't impair the state's general police power to regulate private conduct. And so that is really the kind of the genesis of the division here between public contracts that are entered into by a state and the limitations there versus other measures that affect private contracts only. So I would just point to Blaisdell as the lead case there and the cases that follow suggest that, you know, although it's written in very absolute terms, the Supreme Court has not interpreted it in that way. Excuse me, you have one minute left. Sure. Unless there are more questions on the contract clause, I'll briefly touch on. I have one. Mr. Davies. Just as a matter of trying to understand the record here, there was a hearing on September 11 before the district court. And I understand that was simply oral argument on the motion to dismiss. Is that right? I believe that's correct. Yes. There was no evidentiary hearing on the motion for a preliminary injunction. Is that right? I don't know. I don't believe any evidence was presented. The hearing was argument on the motion. I don't know if they delineated between the preliminary injunction and the motion to dismiss the sort of the argument, but there was no evidentiary hearing. And on the question of the guarantee law, is it your position that the district court reached its conclusion that the guarantee law was constitutional based only on the amended complaint? Is that right? Yeah, based on a failure to state a claim in the amended complaint. They had to amend the complaint because their original plaintiff was actually not affected by the guarantee law. So they had to drop them out and substitute a new plaintiff who arguably is also not affected because their failure to pay started in December 2019. Well, I'm just wondering why isn't this a subject that could probably be a matter of discovery? I mean, this is a decision on the pleadings suggesting taking important decisions regarding what the public interest was or was not. And we are talking about the perpetual loss of money by the by the guarantor. Is that right? That's right. And but I think as the precedents show that because you're determining this sort of on a rational basis test as a matter of law, it's really not generally concerned with or it's not done with actual evidentiary hearings about whether the law was effective or whether it's better than another one. I would point to this court's holding in Buffalo Teachers saying that a court is not required, quote, required to reexamine all the factors and make a de novo determination whether another alternative would have constituted a better statutory solution in quotes. So I think Mr. Davies, is it is it correct to say that there were 16 volumes in the joint appendix here and there was extensive legislative history? There were hearings held. I mean, isn't it fair to say that there is an extensive public record of which the district court could? I don't know if it was fair to say it's incorporated into the complaint, but certainly one could take judicial notice possibly of the hearing reports that were filed and the transcripts of those hearings and so on. That's absolutely right, Your Honor. I think and I think especially in evaluating this kind of kind of law, the courts have looked to the legislative history and the legislative record to show whether there was a legitimate public purpose and whether the legislators actions were reasonable and appropriate to address that public purpose. There wasn't actual evidence in the district court. I want to take you back to Blaisdell when I asked you about limiting principles counsel, because one of the things that Chief Justice Hughes said in Blaisdell was that what is precluded is a construction that would permit the state to adopt as its policy the repudiation of debts or the destruction of contracts. It does not follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the constitutional provision. And so it accepted the fact that the constitutional prohibition should not be construed to prevent limited and temporary interpositions with respect to the enforcement of contract, if necessary, to protect to deal with great emergencies. What my concern is, is has have we gotten off track in thinking that this could also be a permanent repudiation of contracts and debts, which is what the guarantee law would provide here? I would say two responses. First, I don't think it's permanent. It's permanent in the sense that for the debts that arise in that period, they can't be collected, but the law itself is not permanent, and that's consistent. No, no, but that's not what Chief Justice Hughes was talking about. You have permanently impaired that debt obligation. It is wiped off the books. How do we square that with the contract clause? Sure. I think it's important to note there that it's basically it's one contract. It's the mortgage, and there's a temporary alteration in your ability to evict and do things like that on the mortgage here. This is a backup remedy, and the lease itself and the guarantee go together. So if you were to have a policy saying all commercial leases are hereby invalidated and people can just remain tenants in possession, I think that would be closer to what Chief Justice Hughes was suggesting would be a total repudiation and not here where it's a remedy, a backup remedy for obligations under the underlying contract. That is a creature of contract. The guarantor and the lessor enter into a contract. Yes, that's correct. Okay, so my question in general is I know there are cases that have talked about how the contract clause can, in certain circumstances, even totally eradicate the contract, but I'm wondering where there's authority for that in Supreme Court precedent. Sure. I would point you to Blaisdell itself where it held that the government can, quote, abrogate contracts already effect, end quote. That's at 434-35. Temporarily. Temporarily. And I would argue here it is a temporary abrogation. No, no. In Blaisdell, the debt remained in place. You couldn't collect it during a particular period, or am I mistaken? No, that's correct, but I would say here that the debt… This is not a law that says for the next, you know, till the crisis is declared to be over, you can't enforce the guarantee. Once the crisis is over, you can, you know, seek whatever remedies you want. That's not what the law did. So I'm trying to understand where in a construction of the contract clause I would look for it being permissible to totally wipe out a debt. Well, I would say – I would first say it's not really a debt. There's no – it's not the same as a mortgage where you have – you're taking out money, which you have to pay back, and so there's a debt that you owe. Here it's essentially ongoing payment for the use of a premises, so it's a little bit different than repudiating an existing debt. I mean that debt may come due for some subset of contracting parties during the time period, but it's not the same as repudiating, say, repudiating all mortgages in a state or something like that where there's an actual existing debt that comes into effect as a result of the contract being entered into, which then has more protection. Thank you, Judge Cabranes. All right. Mr. Zeifer has some – has reserved some time. Thank you, Judge Cabranes. Your Honors, I want to go back to one of the points that was made during my adversary's argument. There are no protections here for the landlord. When you look at Blaisdell and you look at many of the cases that come forward, you see the type of sort of balancing and protections that are provided to both parties. And I point to Blaisdell at pages 445 and 446 where the court says that the legislature sought to prevent the impending ruin of both parties to the contract, and it was decisive that the mortgagee was not left, quote, without compensation for the withholding of possession. And, indeed, the court later said that the integrity of the mortgage indebtedness was not impaired and the mortgagor was still required to pay fair rental value for the premises. That's not what's happening here. There is a permanent loss of the right if there's a default during this period. And so I go back to, again, the reasonable protections and the moderation or reason that Justice Cardozo spoke about in Worthen. There are no things – there are no – none of those things here. Secondly, this is not just a backup remedy. This is part and parcel of the deal. As I mentioned at the outset, this was a primary inducement, and the lease would never have been executed without having the personal guarantee in place. So this is not just a backup remedy. This is the remedy, in essence, because when a tenant can't pay you, the first person that you go to or the first entity you go to is to the guarantor. And, indeed, I would submit – and, again, I would respectfully refer the panel to House Bill 719, which Marilyn just enacted, which is a much more moderate law that is simply a temporary moratorium on enforcing guarantees and, secondly, provides, as I mentioned, the 180-day breathing room after the end of the guarantee. Those are things that the city council could have done here, but they did not do. Can I interrupt for just a moment, Judge Kouranis? May I have a moment to ask a question? Yeah, of course. Thank you. In Buffalo Teachers, a wage freeze was imposed. Correct. Without promise that it would be reinstated. It had been promised, and money that was promised to be forthcoming then was not forthcoming because of a financial crisis. And we held that that wage freeze didn't constitute taking, and it was reasonable and necessary in the financial circumstances of the city of Buffalo at the time. Didn't that also represent our endorsement of what was basically a permanent financial loss by a large swath of people in the city? Your Honor – How does that differ from this? Yeah, of course, Your Honor. So what I would submit is that, one, what happened in Buffalo Teachers was certainly not what happened here, right? First of all, the Fiscal Stability Authority imposed that wage freeze during a time of economic crisis, and it was only imposed after the authority instituted a hiring freeze, only imposed after it imposed school closings and layoffs, and eliminated positions. So there, the wage freeze, which you're right, was permanent, but only going forward, not retroactive. And here we do have retroactive application of the law. But the wage freeze there was constitutional because the Buffalo Fiscal Stability Authority had already acted in light of the surrounding circumstances and had already tried much more moderate courses available to them. That did not happen here. The city council simply went straight to the complete deprivation of rights. And so I would submit, Your Honor, that Buffalo Teachers is not the same kind of case here. Are you saying that if the city council had imposed some kind of temporary measure for a few months and that had been unsatisfactory from their point of view, people were getting laid off and people couldn't get the services they wanted, that it would have been okay then to impose a measure like this? No, Your Honor. What I'm saying is that if the legislature, the city council would have actually taken seriously more reasonable and alternative things as opposed to just the permanent deprivation. And here in our papers, we submitted many of those things, such as, for example, a delay, which is what's in the House Bill 719 in Maryland, or a temporary moratorium, or in particular, putting together some type of injury requirement. I mean, here the law simply goes too far because it indiscriminately says it applies to all personal guarantees. And so what we submit, Your Honor, is that those things could have been tried. I'm not saying that there should have been a six-month commission or anything like that. But there should have been more integrity to the process. And simply having the letters, there should have been more integrity in looking at what those reasonable alternatives could have been and whether those reasonable alternatives, and we submit they would have, would have helped the situation and would have been less impactful than the permanent deprivation that occurred here. Okay, thank you. And Your Honors, I know if you may have other questions, neither my adversary nor I were able to get to the First Amendment argument. But obviously, we stand on our First Amendment arguments in our papers. And in particular, I would just ask the court to look at our vagueness arguments with respect to, you know, the language of a person impacted by COVID-19. I mean, when you look at the residential harassment law, it's so overbroad and so vague, you know, including such categories as, quote, a person was diagnosed with COVID-19 or is experiencing symptoms. Let me ask you a question on that part of the, or on that law. This is in addition to a law that already exists and that prevents these kind of threats or harassment with respect to race, religion, et cetera, et cetera. Has any court ever held it to apply to routine rent requests? In terms of – Because the district court took the position that no court would ever apply it to routine rent requests. And I just want to know whether you have any case in which a court went that far. No, and Your Honor – So why should we assume they'll do it – I mean, what is added here is another mens rea category. If you do it with that intent. But your vagueness challenge is to language that applies to across the board to the law. And I'm wondering if there's any basis to have the concern you've identified. Yes. Oh, yes, Your Honor. And the concern is exactly this. So when I try to rent an apartment in New York City, I've got to submit a rental application. And that rental application is going to set forth a lot of personal information about me, including my occupation, including I may potentially need a guarantor and information about those people. And so the possibility that a plaintiff's lawyer – and again, the city says, hey, don't worry about it because we're not going to enforce the law against routine rent demand.  In New York City, we're much more concerned about plaintiff's lawyers. There's a private right of action here. And you can bet that a plaintiff's lawyer is going to say, hey, well, that landlord has my lease application, and that lease application sets forth what my occupation is. But that's why I ask you whether in any context, government action, private landlord action, any court had ever applied this law to what you are labeling a routine rent request. Yeah, and the two cases, right, and the two cases that are adversary cited to the Queens Boulevard case and the Dunn case, those were not routine rent requests, right? Those were notices of cancellation and notices to cure. And Your Honor has hit upon exactly what our concern is, that the easy case is going to be the notice to cure or the easy case will be the notice of cancellation. But what we want to be able to do is to be able to start a dialogue with somebody before we have to resort to those things. And that's the type of stuff that we are concerned about will be the basis for a private right of action against us for harassment. And so Your Honor has hit upon the issue. And that's why, you know, the two cases that are adversaries rely upon, the Queens Boulevard case and the Dunn case, those are the easy ones, right? What we're more concerned about is plaintiff's lawyers trying to use this law against us and to essentially hold it as a sort of Damocles so that we can't even start the discussion about, hey, you know, the rent is due. Mr. Davies, maybe you can take a minute to catch up with the argument here. Sure. Sure, Your Honor. It's on the First Amendment argument? On whatever you just heard from Ms. Seifert. Yeah, I'll confine it to the First Amendment argument since I didn't get a chance to go into it. As Judge Rahagi pointed out, there is no court that has thus far held that routine rent demands are implicated by the statute of the kinds that they want to engage in. And the fear that someone might bring an unmeritorious or frivolous claim against a landlord is not a reason to invalidate the statute. There's no basis just because someone might bring a claim that they think is unmeritorious that the statute is completely void. That's not the kind of effect that the First Amendment protects against. My concern, though, with that argument that you advance and that the district court relied on is that vagueness does not mean that by the time you get to court, there's no chance that the law will be interpreted that way. Vagueness requires an average person to understand from the face of the law what is or is not prohibited. And I'm concerned with whether this law satisfies that. Help me out. Sure. I think the key to that argument is that they really read this word threatened in complete isolation from the remainder of the statutory text. But it also it's it's not just what you have to threaten somebody, which in and of itself, I think, is probably constitutional. But to point out that there's context around it. So it has to be harassment that comes in the form of a threat based on someone's covid-19 status. And it has to have the effect of inducing someone or the intent of inducing someone to give up their legal occupancy rights. And so the concern, I guess, is that if a tenant has not paid and you send a letter or somehow communicate you haven't paid your rent, I'm going to resort to my legal remedies. And then you send it again that someone could make a claim that you have threatened them. Now, why should there not be that concern? I mean, I think there there can be a concern that someone can make a claim. Someone can always make a claim. The question is whether in the sort of mind run of cases, someone read someone reading the law would be chilled from engaging in otherwise lawful speech by the threat of of legitimate enforcement action against them. And I think reading the law in context, there just isn't that available. I would also point out that as the vagueness, they don't even really argue the due process arguments in reply. They put them in the headings, but there's actually no further development of the vagueness and due process arguments. If you take a look at their reply brief. But the more fundamental point is that there's just no reasonable way of reading this statute to suggest that it implicates routine rent demands and the existence of the statute for many, many years. It included other categories, obviously, before someone affected by COVID-19 without anyone reaching this question and validating it on the basis of an alleged chilling effect on routine rent demand. And no cases that they can point to where it has ever been held to be implicated by routine rent demands, I think, really supports our position as it's not a tenable reading of the statute. Thanks very much, Mr. Davies and Mr. Deitchel. We will reserve decision.